IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL TASH,

       Petitioner,

  v.

BEN CURRY, Warden,

       Respondent.
_____/

No. C 05-2417 CW (PR)

ORDER GRANTING PETITION
FOR WRIT OF HABEAS CORPUS

On June 15, 2005, Petitioner Paul R. Tash, a state prisoner incarcerated at the Correctional Training Facility at Soledad, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 based upon Governor Arnold Schwarzenegger's reversal of the decision by the Board of Parole Hearings (Board)[1] finding Petitioner suitable for parole.  The Court issued an order to show cause why the writ should not be granted.

On March 16, 2006, Respondent filed a motion to dismiss, which the Court denied on February 1, 2007.  The Court rejected Respondent's substantive claim that California statutory law does not create a federally protected liberty interest in parole release.[2]  (Feb. 1, 2007 Order at 4-5.)

On April 4, 2007, Respondent Warden Ben Curry[3] filed an

_____

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings.  Cal. Penal Code § 5075(a).

[2] Respondent's alternative ground for dismissal was not addressed because he conceded in his reply that Petitioner's ex post facto claim was timely.

[3] The State claims that under Rule 2(a) of the Rules Governing Habeas Corpus Cases Under Section 2254, the proper respondent is Ben Curry, the warden at the Correctional Training Facility where

United States District Court
For the Northern District of California

answer and lodged a copy of the records of the state proceedings.
Petitioner timely filed a traverse.  For the reasons set forth
below, the petition is GRANTED and the matter is remanded to the
Governor to review the Board's decision in accordance with due
process of law.

BACKGROUND

The San Francisco County Superior Court described the facts
of Petitioner's commitment offense as follows:

> On February 8, 1983, Petitioner drove to the
> home of his amphetamine dealer Wiley Haring.
> Petitioner was armed with a gun.  Petitioner's
> friend Ronald Carpenter answered the door and
> told Petitioner that Haring was not home.
> Petitioner left but returned within minutes and
> forced his way into the home.  Carpenter fled
> into the bathroom.  Believing Carpenter bolted
> for a shotgun by the bathroom, Petitioner fired
> three shots through the bathroom door, hitting
> Carpenter above the ear and in the right chest.
> Carpenter died from severe trauma.  No shotgun
> was ever found.  Petitioner fled, was arrested
> shortly thereafter and found guilty of second-
> degree murder.

(Resp't Ex. 4, Sept. 8, 2004 San Francisco County Superior Court
Order at 1.)  Petitioner was sentenced to seventeen years to life
in prison with a two-year enhancement for the use of a firearm.
(Id.)

At his tenth parole hearing in 2004, the Board, in granting
Petitioner a parole date, specifically noted that:

> The prisoner is suitable for parole and would
> not pose an unreasonable risk of danger to
> society or a threat to public safety if

Petitioner is incarcerated.  (Answer at 1 n.1.)  Accordingly, the
Court directs the Clerk of the Court to substitute Warden Ben Curry
as Respondent in this action and delete as Respondents A.P. Kane
and Arnold Schwarzenegger.

2

United States District Court
For the Northern District of California

> released from prison.  The prisoner has no
> juvenile record of assaulting others.  The
> prisoner while in prison has enhanced his
> ability to function within the law upon release
> through participation in educational programs.
> He has a GED and approximately seventy units of
> college work.  Through institutional job
> assignments, he has worked as a teacher's aide
> in the education office, and also as the
> [office] manager . . . in PIA.  Through self-
> help he's participated in AA/NA, Cat-X,
> individual therapy, and he attends chapel.
> Vocational programs, he received a certificate
> in auto mechanics in 1990, and he's taken
> numerous computer classes.  Because of
> maturation, growth, greater understanding and
> advanced age, he has reduced his probability of
> recidivism.  He has realistic parole plans and
> family support[,] . . . has maintained positive
> institutional behavior, which indicates
> significant improvement in self-control, and he
> shows signs of remorse.  He indicated that he
> understands the nature and the magnitude of the
> offense and accepts responsibility for the
> criminal behavior and has a desire to change
> towards good citizenship.  Psychological
> factors, the psychological report . . . states
> [that] ". . . his violence potential is
> estimated to be no more than the average
> citizen in the community."

(Id. at 52-54.)

On June 1, 2004, the Governor, pursuant to California Penal Code § 3041.2, reviewed the evidence considered by the Board and reversed the grant of parole.  In his decision, the Governor found that because Petitioner "maintained that he shot Mr. Carpenter in self defense . . . . [he] appears to be hedging his responsibility."  (Resp't Ex. 2, Governor's Indeterminate Sentence Parole Release Review at 1.)  The Governor further found that Petitioner "demonstrated an especially callous disregard for Mr. Carpenter's suffering and life -- especially if he acted in self-defense."  (Id. at 1.)  In addition, the Governor noted that:

> . . . Mr. Tash committed an especially grave
> and calculated crime.  He chose to arm himself

3

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

before going to buy drugs.  He chose to return
to the apartment after he learned his regular
supplier was not there.  He chose to force his
way into the apartment.  And even as the
bathroom door was closing, he chose to continue
firing at his friend.  Mr. Tash's claim of self
defense is inexplicable, as is his motive for
this senseless murder.

(<u>Id.</u> at 2.)  Finally, the Governor stated that Petitioner's

failure to check on his friend's condition or offer assistance

after the shooting "raises troubling issues" about Petitioner's

character.  (<u>Id.</u>)

After the Governor issued his decision, Petitioner filed a

petition for a writ of habeas corpus in the San Francisco County

Superior Court alleging that the Governor's decision was not

supported by some evidence, and that its sole reliance on the

circumstances of the commitment offense violated his federal due

process rights.  The court denied the writ, concluding that

because the law requires that only "some evidence relevant to the

enumerated factors support the Governor's decision . . . it is

irrelevant that a court might reach a different conclusion."

(Resp't Ex. 4 at 2 (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 677

(2002)).)  The court found that the Governor, while required to

base his decision on the same factors the parole board is required

to consider, was entitled to "independently [review] the

evidence . . . give it different weight and resolve any

conflicts."  (<u>Id.</u>)  Accordingly, the court found that each of the

Governor's justifications for reversal was independently supported

by "some evidence."  (<u>Id.</u> at 3-5.)  The court never reached

Petitioner's claim that the Governor's use of the commitment

offense alone to deny parole violated due process.

Petitioner filed subsequent habeas petitions in the California Court of Appeal and the California Supreme Court. Both petitions were denied. (Resp't Ex. 5, Jan. 12, 2005 California Court of Appeal, First Appellate District Order at 1); (Resp't Ex. 6, Apr. 13, 2005 California Supreme Court Order at 1.)

Petitioner has now filed a federal petition for a writ of habeas corpus challenging the Governor's reversal of the Board's decision. He argues that the state court decision affirming the Governor violated his constitutional right to due process because it involved an unreasonable application of federal law in that there is no evidence to support the Governor's reversal. Petitioner also argues that the Governor's decision reflects the executive's systematic bias against grants of parole and that it violates the ex post facto clauses of the California and federal constitutions.

STANDARD OF REVIEW

The petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply. Lindh v. Murphy, 521 U.S. 320, 327 (1997); McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

Under the AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the

United States District Court
For the Northern District of California

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, Williams, 529 U.S. at 407-09, while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. See id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340. A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness;

conclusory assertions will not do.  Id.  Although only Supreme
Court law is binding on the States, Ninth Circuit precedent
remains relevant persuasive authority in determining whether a
state court decision is objectively unreasonable.  See Clark v.
Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

When there is no reasoned opinion from the highest state
court to consider the petitioner's claims, the court looks to the
last reasoned opinion to analyze whether the state judgment was
erroneous under the standard of § 2254(d).  Ylst v. Nunnemaker,
501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d
1072, 1079 n.2 (9th Cir. 2000).  In the present case, the last
state court opinion to address the merits of Petitioner's claim is
the reasoned opinion of the San Francisco Superior Court.

DISCUSSION

As noted above, under California law, the Governor considers
the same factors as the Board in determining whether to affirm or
reverse the Board's decision.  Cal. Const., art. V, § 8(b); In re
Rosenkrantz, 29 Cal. 4th at 660.

The Supreme Court has clearly established that a parole
board's decision deprives a prisoner of due process with respect
to his constitutionally protected liberty interest in a parole
release date if the board's decision is not supported by "some
evidence in the record," or is "otherwise arbitrary." Sass v.
California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.
2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)).
The standard of "some evidence" is met if there was some evidence
from which the conclusion of the administrative tribunal could be

United States District Court
For the Northern District of California

deduced.  Hill, 472 U.S. at 455.  An examination of the entire record is not required nor is an independent weighing of the evidence.  Id.  The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board.  Id.

When assessing whether a state parole board's suitability determination, or in the present case the Governor's reversal, was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant State.  Sass, 461 F.3d at 1128. Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle.  Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the parole authority is required to consider.  See Cal. Code Regs. tit. 15, § 2402(b) (2001).  These include "[a]ll relevant, reliable information available," such as:

the circumstances of the prisoner's social

8

history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Id. § 2402(c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail.  Id.

Circumstances tending to support a finding of suitability for

parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release.  Id. § 2402(d).

Respondent argues that, under AEDPA, the "some evidence" standard of Hill does not apply to parole suitability hearings because the United States Supreme Court has not applied it in that context.  Respondent claims the due process protections to which California prisoners are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial.  This position, however, has been rejected by the Ninth Circuit, which held in Sass that a prisoner's due process rights are violated if the Board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."  461 F.3d at 1128-1129.  The "some evidence" standard identified is thus clearly established federal law in the parole context for purposes of § 2254(d).  Id.

Respondent next argues that the Governor did identify "some evidence" to support his reversal of the Board's decision, including "the gravity of the offense, the inexplicable motive for the crime, and Petitioner's failure to take responsibility for the murder he committed."  (Answer at 9.)  The Governor's assertions

10

**United States District Court**
For the Northern District of California

raise two critical issues in this case.  First, do the facts relating to Petitioner's commitment offense alone satisfy the "some evidence" standard, more than twenty-five years after he committed the offense?  And second, does "some evidence" support the Governor's assertion that Petitioner currently "appears to be hedging his responsibility?"  Under the circumstances of this case, the Court finds that both questions should be answered in the negative.

In Biggs v. Terhune and Sass, the Ninth Circuit made observations on the effect of continued denial of parole based solely on unchanging factors such as the inmate's commitment offense and prior criminal history.  See Biggs v. Terhune, 334 F.3d 910, 917 (9th Cir. 2003); Sass, 461 F.3d at 1129.  In Biggs, the court, in dicta, stated that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 917.  The Ninth Circuit's opinion in Irons v. Carey sheds further light on whether reliance on an immutable factor such as the commitment offense violates due process.  505 F.3d 846, 850 (9th Cir. 2007).  In Irons, the District Court for the Eastern District of California granted a habeas petition challenging the parole board's fifth denial of parole where the petitioner had served sixteen years of a seventeen years to life sentence for second degree murder with a two-year enhancement for use of a firearm, and where all factors indicated suitability for parole; however, the Ninth Circuit

11

reversed.  358 F. Supp. 2d 936, 947 (E.D. Cal. 2005), <u>rev'd</u>, 505

F.3d 846 (9th Cir. 2007).  The Ninth Circuit limited its holding

to inmates deemed unsuitable prior to the expiration of their

minimum sentences and left the door open for inmates deemed

unsuitable after the expiration of their minimum sentences.  505

F.3d at 854.  The Ninth Circuit stated:

> We note that in all the cases in which we have
> held that a parole board's decision to deem a
> prisoner unsuitable for parole solely on the
> basis of his commitment offense comports with
> due process, the decision was made before the
> inmate had served the minimum number of years
> required by his sentence.  Specifically, in
> <u>Biggs</u>, <u>Sass</u>, and here, the petitioners had not
> served the minimum number of years to which
> they had been sentenced at the time of the
> challenged parole denial by the Board.  <u>Biggs</u>,
> 334 F.3d at 912; <u>Sass</u>, 461 F.3d at 1125.  All
> we held in those cases and all we hold today,
> therefore, is that, given the particular
> circumstances of the offenses in these cases,
> due process was not violated when these
> prisoners were deemed unsuitable for parole
> prior to the expiration of their minimum terms.

<u>Id.</u> at 853-54.  The court recognized that at some point after an

inmate has served his minimum sentence, the probative value of his

commitment offense as an indicator of an unreasonable risk of

danger to society recedes below the "some evidence" required by

due process to support a denial of parole.  <u>Id.</u>

Unlike Biggs, Sass and Irons, at the time of the Board's

decision at issue here, Petitioner had served more than five years

after the expiration of his minimum seventeen-year sentence.  Even

under the Governor's version of the facts, much distinguishes the

present case from <u>Biggs</u>, <u>Sass</u> and <u>Irons</u>, and pushes it beyond the

point at which sole reliance on the commitment offense may be said

United States District Court
For the Northern District of California

to constitute "some evidence" in compliance with due process.

The record contains substantial evidence to support the Board's finding of parole suitability under the factors contained in the California Code of Regulations.  First, Petitioner's social history is mostly positive.  Petitioner's June 14, 2000 psychiatric evaluation states that he had a normal childhood and suffered no abuse of any kind.  (Pet'r Ex. C, June 14, 2000 Psychological Evaluation for the Board of Prison Terms at 1.) Petitioner also has working relationships with his parents and one sibling, from whom he receives visits and letters of support on a regular basis. (Id. at 1.)

When considered as a whole, Petitioner's past and present mental state also supports a finding of parole suitability. Petitioner admits to a period of substance abuse which led him to commit the offense of which he was convicted. (Resp't Ex. 3 at 9.)  After spending more than twenty-five years in prison, Petitioner's mental stability and thought processes have improved markedly.  His most recent psychiatric evaluation indicates that his intellectual function is "above average," that he has matured significantly since his incarceration, and that his judgment "appears to be sound." (Pet'r Ex. C at 3.)  Further, the report states that he is no more disposed toward violent behavior "than an average member in the community." (Id.)  Even so, the report suggests that Petitioner would be significantly more dangerous if he were to begin using amphetamines again.  (Id.)  Petitioner has addressed that concern during his incarceration, however, by attending a substantial number of therapy programs including Alcoholics Anonymous (AA) and Narcotics Anonymous (NA).  (Resp't

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Ex. 3 at 27-28.)   The Board was impressed that Petitioner "knew the steps" of the twelve-step program and "[took] it seriously." (Id. at 33.)   Petitioner has stated that he intends to continue those programs after his release from prison.  (Id. at 39.)   He informed the Board that he had located AA and NA meetings held within walking distance of his parents' house, where he would be living.  (Id.)

Petitioner's criminal history leading up to the commitment offense was characterized in his psychiatric evaluation as "minimal."   The record indicates that Petitioner had no juvenile convictions of any kind.   In the late 1970s, Petitioner began using amphetamines which he explains led him to commit several minor crimes including possession of drug paraphernalia and exhibiting a firearm in a threatening manner.  (Resp't Ex. 3 at 18).   Petitioner states that his amphetamine use played an integral role in his criminal behavior leading up to and including the commitment offense.

The California Code of Regulations also calls for consideration of a prisoner's behavior before, during and after the commitment offense as well as any treatment programs that a prisoner has attended or continues to attend.   While Petitioner's drug abuse prior to the offense and conduct during the offense do not weigh in favor of parole suitability, his outstanding conduct since his incarceration does.   The Board noted that Petitioner has not received a rules violation report since 1996.  (Resp't Ex. 3 at 30.)   Petitioner's Life Prisoner Evaluation Report states that his behavior prior to his parole hearing was "positive, in that he has remained disciplinary-free and has continued to maintain an

above-average work record at his assignment in textiles." (Pet'r
Ex. B, August, 2003 Life Prisoner Evaluation Report at 3.)  He
also regularly attended NA meetings prior to his parole
consideration hearing and continues to do so now. (Id.)  Upon
release, Petitioner intends to live with his supportive family in
southern California, to continue NA meetings, and to maintain
steady employment. (Id.)  Ultimately, the report states that
Petitioner "would probably pose a low degree of threat to the
public at this time, if released from prison." (Id. at 4.)

All of the other circumstances listed in Title 15 of the
California Code of Regulations § 2402(d) indicate that Petitioner
is suitable for parole, including his signs of remorse, reduced
possibility of recidivism due to his present age (forty-eight),
realistic plans for release, marketable skills that can be put to
use upon release (office management), and participation in
institutional activities such as NA and therapy that indicate an
enhanced ability to function within the law upon release. See
Cal. Code Regs. tit. 15, § 2402(d).

The Governor reversed the Board's findings based upon a
number of the unsuitability factors contained in the California
Code of Regulations.  The Governor found that Petitioner would
pose an unreasonable danger to the community if released because
Petitioner's breaking into a drug-dealer's apartment and
subsequently murdering his friend "demonstrated an especially
callous disregard for [the victim's] suffering and life --
especially if [Petitioner] acted in self-defense." (Resp't Ex. 2
at 2.)  Title 15 of the California Code of Regulations § 2402(c)
refers to whether the offense was committed in an "especially"

15

heinous, atrocious, or cruel manner.  Two of the factors listed under § 2402(c) do not apply to Petitioner's offense because there was a single victim, and the victim was not defiled.  _Id._ at § 2402(c).  Three factors under § 2402(c) could show Petitioner committed the offense in an especially heinous, atrocious, or cruel manner:  whether the offense was calculated or dispassionate; whether the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering; and whether the motive was trivial.  (_Id._)

The Governor found that the offense itself was calculated and dispassionate.  The District Attorney charged only second degree murder, which does not entail calculation or a lack of passion.  In finding Petitioner suitable for parole, the Board only briefly summarized Petitioner's offense and did not characterize it as calculated or dispassionate.  (Resp't Ex. 3 at 8-13, 52-56.)

The Governor also found that Petitioner "demonstrated an especially callous disregard for Mr. Carpenter's suffering and life" regardless of which version of the facts one chooses to believe.  He asserts that this conclusion is supported by Petitioner's failure to check on his friend or seek any assistance after he was wounded.  (Resp't Ex. 2 at 2.)  At the parole hearing, Petitioner stated that he did not know at the time of the shooting whether he had actually injured his friend.  (Resp't Ex. 3 at 12.)  Furthermore, even if Petitioner had checked on the victim, it is unlikely that he would have survived because he had sustained a gunshot wound to his head.  (_Id._)  The facts as stated, even in the Governor's decision, do not demonstrate more callousness than is minimally necessary for a second degree murder

conviction.  Compared to other second degree murders, Petitioner's offense was not "exceptionally" callous, and neither the Governor nor the state court cited any facts that show otherwise.

The Governor also found that Petitioner's "claim of self-defense is inexplicable, as is his motive for this senseless murder." (Resp't Ex. 2 at 3.)  Although a trivial motive is a factor tending to support a determination that the offense was committed in an especially heinous, atrocious, or cruel manner, they are not synonymous.  See Cal. Code Regs. tit. 15, § 2402(c)(1)(E).  Respondent does not show that Petitioner's unyielding desire to obtain drugs or his frustration with being unable to satisfy his physical dependence upon them were any more trivial than the usual motives for murder.  Petitioner's motive was trivial in relation to the offense, but this alone does not establish that the offense was especially heinous.

The Governor has also asserted that Petitioner "appears to be hedging his responsibility" because he "has maintained" that he acted in self-defense despite a lack of evidence that his use of lethal force was necessary.  (Resp't Ex. 2 at 2.)  The trial court found that the Governor's doubts were supported by "some evidence," stating, "Although Petitioner says he is remorseful, he also maintains that he shot in self-defense, and the Governor finds no evidence in the record substantiating Petitioner's self-defense claim." (Resp't Ex. 4 at 5.)

The Governor's assertion is not based on "some evidence." While Petitioner claimed at trial that he acted in self-defense, the record does not indicate that Petitioner is currently hedging responsibility for his crime.  In fact, it demonstrates just the

opposite.  While the Petitioner did state at his parole hearing

that he thought at the time of the offense that Mr. Carpenter was

going for a gun, he also expressed doubt about his prior

understanding of what had really happened:

> PRESIDING COMMISSIONER RISEN:  So you were
> saying it was self defense
>
> INMATE TASH: Well, I just -- I was just trying
> to explain how it all happened.  There was a
> gun in front of the bathroom.  I was sure of
> it.  And now I'm not so sure what was
> there . . . .

(Resp't Ex. 3 at 15.)  During his parole hearing, Petitioner stated

several times that he, not Mr. Carpenter, was responsible for the

incident:

> No, this is -- You know, I make no effort to
> mitigate any of this.  You know, Mr. Carper
> [sic] would be alive right now if I hadn't of
> gone over there . . . .
>
> You know, I've come to believe over the years
> of thinking about this that there, you know, --
> it really doesn't matter if there was someone
> there or if he had a gun there or not, you
> know.  All of this could have been avoided had
> I not been there.  So whatever happened or
> whatever was laid out or whoever was inside, it
> really shouldn't matter because my part is I
> should have never stepped through the door.

(Id. at 14, 16.)  In addition, Petitioner expressed remorse

concerning the result of his conduct:

> This is horrible.  I mean this was a friend of
> seven years.  You know, if I don't go back, if
> I don't go at all, this man is still alive and
> maybe has kids by now.  And look at all the
> things that I stopped from happening to this
> guy, his family, and -- I don't even know if he
> had a family at the time . . . .

(Id. at 12.)  According to his most recent psychiatric evaluation:

> [Petitioner] showed good insight into his
> committing offense . . . .  He acknowledged
> making bad choices and takes responsibility for
> his crime.  And he showed throughout the

United States District Court
For the Northern District of California

18

1

reports that he had adequate amounts of empathy
for the victim . . . .

2

(Id. at 48.)  All of this evidence weighs heavily against the

3

Governor's finding that Petitioner "appears to be hedging his

4

responsibility."

5

Even if, for a certain period of time, the commitment offense

6

and Petitioner's self-defense claim provided some evidence of

7

unsuitability based upon Petitioner's present danger to the

8

community, the Governor's reversal does not comport with federal

9

due process standards because at some point, the commitment

10

offense can no longer constitute the sole reason for a finding of

11

parole unsuitability.  Biggs, 334 F.3d at 917.

12

Respondent cites In re Dannenberg in support of his argument

13

that parole can be denied based solely on the commitment offense

14

or other static factors without violating due process.  34 Cal.

15

4th 1061, 1095 (2005).

16

Although In re Dannenberg held that the Board may rely on the

17

commitment offense to deny parole by heavily weighing its degree

18

of violence and viciousness, the offense must be "particularly

19

egregious" to justify parole denial under California law.  Id. at

20

1070.  As discussed above, the circumstances of this offense were

21

not more aggravated or violent than the minimum necessary to

22

sustain a conviction for second degree murder.  Although he

23

committed the murder by shooting Mr. Carpenter, Petitioner did not

24

inflict additional violence on him.

25

In a recent decision, In re Lawrence, the California Supreme

26

Court held that the assumption that "a particularly egregious

27

commitment offense always will provide the requisite modicum of

28

evidence supporting the Board's or the Governor's decision," as In

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

re Rosenkrantz and In re Dannenberg had been interpreted to imply, was "inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole . . . recognized in Rosenkrantz." In re Lawrence, Case No. S154018, slip op. 1, 3 (Cal. Aug. 21, 2008) (citing In re Rosenkrantz, 29 Cal. 4th at 664). The Board found Lawrence suitable for parole for the fourth time, after she had been in custody for twenty-four years on her life sentence for first degree murder, and the Governor again relied upon the circumstances of the offense to justify his reversal of the Board's decision as was the case for the three prior reversals. In re Lawrence, slip op. at 14-17. Lawrence filed a state habeas petition in the California Court of Appeal and challenged on several grounds the Governor's decision. Id. at 17. The appellate court in a split decision issued a writ vacating the Governor's reversal and reinstating the Board's latest finding of parole suitability. Id. The California Supreme Court affirmed the appellate court's finding that the record failed to support the Governor's conclusion that Lawrence remained a current danger to public safety upon holding that the commitment offense alone did not constitute "some evidence" that the prisoner poses a threat to public safety:

> In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is

United States District Court
For the Northern District of California

> unlikely to recur, the immutable circumstance
> that the commitment offense involved aggravated
> conduct does not provide "some evidence"
> inevitably supporting the ultimate decision
> that the inmate remains a threat to public
> safety.

Id. at 3.  The court found a due process violation and concluded

that:

> although the Board and the Governor may rely
> upon the aggravated circumstances of the
> commitment offense as a basis for a decision
> denying parole, the aggravated nature of the
> crime does not in and of itself provide some
> evidence of current dangerousness to the public
> unless the record also establishes that
> something in the prisoner's pre- or
> post-incarceration history, or his or her
> current demeanor and mental state, indicates
> that the implications regarding the prisoner's
> dangerousness that derive from his or her
> commission of the commitment offense remain
> probative to the statutory determination of a
> continuing threat to public safety.

Id. at 36.

In contrast, in the companion case of In re Shaputis, the

California Supreme Court applied the "some evidence" standard as

clarified in In re Lawrence and did not find a due process

violation upon considering the issue of "current dangerousness" of

the petitioner, stating:

> By statute, it is established that the gravity
> of the commitment offense and petitioner's
> current attitude toward the crime constitute
> factors indicating unsuitability for parole,
> and because in this case these factors provide
> evidence of the risk currently posed by
> petitioner to the community, they provide "some
> evidence" that petitioner constitutes a current
> threat to public safety.

In re Shaputis, Case No. S155872, slip op. 1, 2 (Cal. Aug. 21,

2008) (citations omitted).  Following several unfavorable parole

hearings and after rulings by the superior court as well as the

21

Court of Appeal, the Board complied with the mandate of an earlier
judicial decision and "reluctantly" found Shaputis suitable for
parole after he had been in custody for more than eighteen years
on his seventeen-year-to-life sentence for the second degree
murder of his wife. Id. at 1, 11-12. The Governor, however,
reversed the Board's decision, upon concluding that Shaputis
constituted a threat to public safety and, specifically, that the
gravity of the offense as well as his lack of insight and failure
to accept responsibility outweighed the factors favoring
suitability for parole. Id. at 13. In a split decision, the
Court of Appeal issued a writ vacating the Governor's reversal.
Id. at 14. The California Supreme Court concluded that the
appellate court erred in setting aside the Governor's decision
because "the Court of Appeal majority improperly substituted its
own parole suitability determination for that of the Governor."
Id. at 16-17. The state supreme court held that Shaputis's claim
that the shooting was an "accident," considered with "evidence of
[his] history of domestic abuse and recent psychological reports
reflecting that his character remains unchanged and that he is
unable to gain insight into his antisocial behavior despite years
of therapy and rehabilitative 'programming,'" all provided "some
evidence" in support of the Governor's conclusion that Shaputis
remained dangerous and was unsuitable for parole. Id. at 23-24.

Here, Petitioner was found not suitable at nine parole
consideration hearings prior to 2004. He was finally found
suitable for parole at his tenth Board hearing, after he had been
in custody for twenty-two years on his seventeen years to life

22

sentence.  (He has now been in custody for more than twenty-five years.)  The Governor looked at the same evidence as the Board and reached the opposite conclusion.

This case is analogous to In re Lawrence, and it is just the sort of case the Ninth Circuit envisioned in Biggs, Sass and Irons:  where the commitment offense is repeatedly relied on to deny parole notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense.  The murder here, while terrible, was not notably worse than other second degree murders.  Further, the crime was aberrant behavior rather than part of continuing violent criminality.  In light of the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the murder to deny Petitioner parole for the tenth time -- twenty-two years into his minimum seventeen year sentence -- violated his right to due process.  The "some evidence" standard provides more protection than against fabricated charges or bureaucratic mistakes; the "some evidence" standard also protects against arbitrary decisions.  See Hill, 472 U.S. at 454-55, 457.  The state court's conclusion that there was "some evidence" to support the Governor's decision and its failure to consider in its assessment the factors showing parole suitability, such as Petitioner's rehabilitation, psychological stability, and remorse for the offense, constituted an unreasonable application of Hill. Id.

Petitioner is entitled to relief under 28 U.S.C. § 2254(d) because the Governor's reversal of the Board was not supported by

23

"some evidence" and the state court's decision was an unreasonable application of federal law.

Accordingly, the Court GRANTS the petition for a writ of habeas corpus and remands to the Governor to review the Board's decision in accordance with due process of law.

Petitioner also raises two alternative grounds for habeas relief.  While there is no need to address these claims because Petitioner is entitled to relief based on his first claim, the Court will do so below.

In his second claim, Petitioner contends that the Board failed to act impartially in his case due to a systematic bias in the California parole system.  (Pet. at 12-13.)  Petitioner asserts that according to "available state government statistical data" the Board and the Governor together routinely deny parole in ninety-seven percent of all cases.  (<u>Id.</u> at 12.)  He claims a systematic bias deprived him of his liberty interest in parole.  (<u>Id.</u>)  It may be logical to deduce that the current parole denial rates evidence a predisposition on the part of the Board and the Governor to deny parole.  However, Petitioner has not proven that this alleged predisposition played any role in the Governor's decision in his case.  Therefore, this claim fails.

Petitioner's third claim is that the Governor's reversal of the Board's decision is a violation of the ex post facto clauses of the California and federal constitutions.  "The ex post facto prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  <u>Connor v. Estelle</u>, 981 F.2d 1032, 1033

**United States District Court**
For the Northern District of California

(9th Cir. 1992) (internal citations omitted).  "In accord with these purposes . . . two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."  <u>Weaver v. Graham</u>, 450 U.S. 24, 29 (1981).  Under the second prong, a retroactively applied parole rule violates the ex post facto clause if it "creates a significant risk of prolonging [the prisoner's] incarceration."  <u>Garner v. Jones</u>, 529 U.S. 244, 251 (2000).  The "significant risk" must not be speculative or ambiguous.  <u>Scott v. Baldwin</u>, 225 F.3d 1020, 1023 (9th Cir. 2000).

Here, Petitioner argues that "the Governor's exercise of his parole review/reversal authority in this case constituted a federally prohibited ex-post facto application of law which increased the severity of his punishment."  (Pet. at 19.)  Petitioner does not claim that a <u>new</u> law is being applied retroactively to his case.  He does not allege that the State has changed the formula to calculate parole eligibility or suitability as applied to himself.  <u>See</u> <u>Nulph v. Faatz</u>, 27 F.3d 451, 455-56 (9th Cir. 1994) (the ex post facto prohibition forbids the States from enhancing the measure of punishment by significantly reducing a prisoner's opportunity to shorten his prison term by altering the "substantive formula" used to calculate parole eligibility or suitability).  The Governor's reversal did not impose any punishment beyond that to which Petitioner was originally sentenced.  Accordingly, the Court finds that Petitioner's allegations do not state a cognizable claim for an ex post facto violation.

United States District Court
For the Northern District of California

CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is GRANTED.  The Court remands to the Governor to vacate his previous decision within sixty (60) days.  The Board's decision granting parole shall be deemed reinstated as of the date the Governor's reversal is vacated.  Within thirty (30) days thereafter, the Governor, in his discretion, may issue a new decision re-evaluating Petitioner's suitability for parole in accordance with this Order, or he may allow the Board's decision to stand.  The Court retains jurisdiction to review compliance with its order.

The Clerk of the Court shall terminate all pending motions, enter judgment and close the file.  Each party shall bear his own costs.

DATED: 8/27/08

_____
CLAUDIA WILKEN
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

TASH,                                          Case Number: CV05-02417
                                               CW
            Plaintiff,
                                               **CERTIFICATE OF
   v.                                          SERVICE**

KANE et al,

            Defendant.
_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 27, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jessica N. Blonien
Attorney General's Office
for the State of California
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

Paul R. Tash  C-73850
California Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Ben Curry, Warden
California Training Facility
P.O. Box 686
Soledad, CA 93960-0686

Dated: August 27, 2008

                                 Richard W. Wieking, Clerk
                                 By: Sheilah Cahill, Deputy Clerk